## The Warren.[1]

### (*Circuit Court, E. D. New York.* July 11, 1885.)

1. COLLISION—STEAM-BOATS CROSSING—RIGHT OF WAY—SPEED—APPORTIONMENT —COSTS.
    A collision having happened between the·steam-boat O., going up the East river, and the ferry-boat W., crossing the river from Williamsburgh to New York, the O. was held in fault, because, having the W. on her starboard side, and being bound to avoid her, she undertook to pass between her and the New York shore, and also for proceeding at a greater rate of speed than 10 miles an hour, prescribed by law, (Laws, N. Y. 1848, c. 321, § 1;) and the W. was held in fault in starting up when she saw the O. was intending to cross her bows, and was coming at full speed.

2. SAME—DAMAGES.
    Both parties having appealed, and the decree of this court being substantially the same as that of the district court, on the merits, and in apportioning the damages, this court apportioned the costs of both parties in both courts. See *The Warren*, 11 Fed. Rep. 443.

Appeal in Admiralty.

On new proofs in the circuit court the value of the boiler of the O. was fixed at $1,700. See *The Warren*, 17 Fed. Rep. 704, and note, *infra*. There being but one action, the district court apportioned the damages and gave the libelant full costs. Both parties appealed.

*James K. Hill, Wing & Shoudy,* and *R. D. Benedict,* for the Olyphant.

*F. A. Wilcox,* for the Warren.

In this case the court, BLATCHFORD, Justice, found the following facts:

(1) On the fourteenth of January, 1880, the libelant Shortland was the owner of the side-wheel steam-boat G. T. Olyphant, which was a passenger steam-boat running between pier 17, East river, and Hunter's point, Long Island.

(2) On the afternoon of that day, shortly after 3 o'clock, the said steam-boat left said pier 17 on one of her regular trips, being tight and staunch, and in charge of a competent master and crew, the master and a competent wheels-

---

[1] Reported by R. D. & Wyllys Benedict, Esqs., of the New York bar.

man being in her pilot-house in charge of her navigation, and a competent engineer in charge of her engine.

(3) About the same time the side-wheel steam ferry-boat Warren left her slip at Williamsburgh, on one of her regular trips on the ferry between Grand street on the Brooklyn side, and Grand street on the New York side, of the East river. The distance from slip to slip is about half a mile. The width of the river is about one-quarter of a mile. The tide was strong ebb, and setting towards the New York shore, and the weather was fair. When about in the middle of the river, the Warren, then heading for about her New York slip, stopped her machinery to permit the steam-boat Harlem to cross her bow, the Harlem then being bound down the East river, nearer the New York shore, intending to make a landing at the outer end of the pier at the foot of Grand street, which forms the southern boundary line of the lower ferry-slip on the New York side, into which the Warren was bound.

(4) When the Olyphant was about off Corlear's Hook, those in charge of her perceived the Harlem coming down the East river, a little on the starboard hand of the course of the Olyphant, and intending to make said landing, which she indicated to the Olyphant by blowing one whistle.

(5) Those in charge of the Olyphant also saw at the same time the Warren, in the middle of the river, with her machinery stopped, drifting with the tide, and waiting till the Harlem should be so far down the river as not to interfere with the entrance of the Warren into said New York ferry slip, it being then known to those on the Olyphant that the Warren was bound for said ferry slip.

(6) An eddy extended out from the New York docks, variously estimated at from 50 to 100 feet wide, and the Olyphant was hugging the New York shore to take advantage of this eddy, and not stem the tide. Her course below the point of Corlear's Hook was about parallel with the outer ends of the New York piers, making her head towards Williamsburgh.

(7) The Olyphant answered the whistle of the Harlem with one whistle, and the helm of the Olyphant was thereupon ported a little, and her course changed sufficiently to enable the Harlem to make her landing inside of the course of the Olyphant, and the wheel of the Olyphant was then steadied, and her course was straightened up parallel with the line of the piers, and she passed about 50 feet outside of the Harlem, as the latter was about to make her landing, the Olyphant intending to pass between the Warren and the New York shore, and being on a course to do so, and such intention being manifest to those on board of the Warren.

(8) Just as the Olyphant passed the Harlem, the Warren, which had all the time, by the drift of the tide and her momentum, been nearing the New York shore, started ahead and blew one whistle to the Olyphant, which the Olyphant answered with one whistle immediately, and the wheel of the Olyphant was at once put hard a-port, and her head was turned off shore, so that she sheered out five or six points before the collision. The bells of the Olyphant, and also those of the Warren, were rung in quick succession, to slow, stop, and back, before the collision.

(9) The Olyphant was running at the rate of from 11 to 15 miles an hour, and so continued until she was but a short distance away from the Warren, and until it was too late to avoid a collision.

(10) The port bow of the Warren struck the port side of the stem of the Olyphant, turning her stem down the river, and forcing her back towards the New York piers, and sinking her.

(11) The collision took place about 100 feet out from the end of the Broome-street pier, and a little below it, the Olyphant being at the time about half in the ebb-tide and half in the eddy.

(12) The value of the Olyphant at the time of the collision was $16,000. She was totally lost, except that her boiler and some of her furniture was

saved and realized to the libelant Shortland, over and above the expenses thereof, the sum of $1,096.87.

(13) The other libelants sustained damages by said collision to the amounts reported in their favor, respectively, in the report of the commissioner.

On the foregoing facts the court found the following conclusions of law:

(1) The Warren was in fault, and the Olyphant was in fault, and the fault of each caused and contributed to said collision. .

(2) The libelant Shortland is entitled to recover of the Warren the sum of $7,456.57, with interest from January 31, 1880.

(3) The other libelants are entitled to recover of the Warren one-half of the sums reported by the commissioner as their respective damages, with interest from the several days specified in said report.

(4) The costs of the parties in the district court and in this court should be equally apportioned between them.

And the court also made and filed the following opinion:

BLATCHFORD, Justice.    The Olyphant was in fault because, having the Warren on her starboard side, and being bound to avoid her, she undertook to pass between her and the New York shore, instead of passing under her stern, knowing the destination of the Warren, and seeing her drift, and knowing that the Warren could not reasonably suppose that the Olyphant would attempt to pass between her and the New York shore.    The Olyphant was also in fault in her excessive rate of speed,—a rate beyond that of 10 miles an hour, prescribed by section 1 of chapter 321 of the Laws of New York of 1848, for steam-boats passing up and down this part of the East river.    If her speed had been less, there would have been no collision.    The Warren was in fault in starting up when she saw that the Olyphant was intending to pass across her bows, and was coming on at full speed.    I fix the value of the Olyphant at the same sum as the commissioner and the district court.

On the new proofs in this court, I think the value of the boiler should be fixed at $1,700.[1]

Although the district court divided the damages, it gave full costs to the libelant Shortland.    He contends that if the damages were divided the costs should have been.    According to the decision in *The America*, 92 U. S. 432, 438, the costs in the district court, of both parties, should have been equally apportioned.    And as both parties have appealed, and the decision here is substantially the same as that in the district court, it seems proper that the costs of both parties in this court should be equally apportioned.    *The America, ubi supra.*

---

[1] The testimony of the libelant in the circuit court as to the value of the boiler of the Olyphant was to the effect that before he sold the boiler he advertised it several times, and notified everybody he thought wanted a boiler, that a new one like it would be worth $3,500, but he had to sell this one as a second-hand boiler, and could not obtain more than $1,700 for it, which was the sum for which it was finally sold by him. See the opinion of the district court on exceptions to the commissioner's report, fixing the value of the boiler at $3,500, at 17 Fed. Rep. 704.—[REP.